UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 23-CR-218 (RDM) |
| v. : | |
| : | |
| SCOTT COLUMBUS, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Scott Columbus to three years of probation with a condition of 60 days of home confinement and $500 in restitution.

I.   **Introduction**

Defendant Scott Columbus, a forty-year-old from upstate New York, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Columbus pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, probation with a period of home detention is appropriate in this case because Columbus: (1) knowingly entered the Capitol building at the Parliamentarian side door, amid signs of the violent breach that were still fresh and obvious; (2) only left the Capitol building after being forced out by police officers who deployed pepper spray; (3) even after being expelled, he remained on Capitol grounds for an additional thirty minutes as chaos ensued; and (4) continues to minimize his actions and personal agency in the decision to enter the Capitol, falsely claiming he was "pushed in" by the crowd.

The Court must also consider that Columbus' conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Columbus crime support a sentence of three years of probation with a condition of 60 days of home confinement.

## II.     Factual and Procedural Background

*The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 1-Attachment A (Statement of Offense), at 1-2.

*Defendant Columbus' Role in the January 6, 2021, Attack on the Capitol*

Unhappy with the 2020 election results, on January 5, 2021, Scott Columbus and Renee Fatta[2] drove together from New York State to a hotel in Maryland with the intention of attending

---

[2] Fatta also pleaded guilty to 5104(e)(2)(G), in front of Judge Nicholas (23-cr-217-CJN) and received a sentence of 24 months reporting probation on October 25, 2023. Judge Nicholas cited Ms. Fatta's remorse and mitigation presented as the basis for his sentence. The government requested 14 days of intermitted confinement and 36 months of probation.

former President Donald Trump's 'Stop the Steal' rally on the Ellipse. On January 6, 2021, Columbus and Fatta attended the rally.

After the rally, Columbus and Fatta walked to the Capitol grounds where they entered the restricted perimeter on the west side. Columbus and Fatta spent an undetermined amount of time on the West Plaza before ascending to the Upper West Terrace.



*Image 1: Still from open source depicting Columbus and Fatta (yellow square) in the crowd that amassed on the west side of the Capitol.*

On the Upper West Terrace, rioters violently kicked in the Parliamentarian door located on the inner north side of the UWT. The door was breached at approximately 2:42 pm. *Ex. 1* at 2:18. Columbus and Fatta entered the Capitol Building through those doors at 2:45 pm. CCTV captures Columbus and Fatta smiling as they enter and Fatta appearing to dance. *Id*. at 5:56-6:06.



*Image 2: Still from Exhibit 1 capturing Columbus and Fatta's entrance.*

Upon entering, Columbus and Fatta walked into the Parliamentarian's office suite to the immediate right of the doors. Columbus and Fatta spent about twenty seconds in the suite, where they observed other rioters ransacking the private office space. *See* Ex. 3 and 4. Despite witnessing up close the destruction wreaked by the rioters, Columbus and Fatta made the decision to not leave through the nearby exit, but to venture further into the Capitol building. *Ex. 1* at 6:20-6:40.



*Image 3: Exhibit 1 still capturing Columbus and Fatta entering the Parliamentarian's office suite.*

Columbus and Fatta continued walking through the Capitol until they were stopped by a line of MPD officers who were preventing rioters from advancing further. Other rioters yelled "push back!" as they attempted to get around the officers. Fatta can be seen in the group, smiling and waving, with a marijuana vape pen in her hand. *Ex.4* at :49.

Columbus and Fatta spent approximately two minutes near the police line and began to exit only once police officers began deploying pepper spray on the crowd. *Ex. 4* at :50-1:15. Columbus and Fatta exited the Capitol building at approximately 2:48 p.m. through the Parliamentarian side door. Ex. 1 at 8:25-9:00.



*Image 4: Exhibit 1 still showing Columbus' and Fatta's exit.*

Despite their expulsion from the Capitol building, Columbus and Fatta spent at least an additional thirty minutes on the Upper West Terrace. See *Ex. 5* at 41:14-48:41.



*Image 5: Still from Exhibit 5 (MPD BWC) showing Columbus and Fatta remaining on Capitol grounds after their expulsion from the building.*



*Image 6: Still from Fatta's Facebook showing a jubilant Columbus on the Upper West Terrace after his expulsion from the Capitol.*

*Columbus' Pre-arrest Interview with the FBI*

On January 13, 2022, Columbus was interviewed by the FBI in his home. Columbus told agents that he drove Fatta from New York to Maryland on January 5, 2021. On January 6, Columbus and Fatta took the train into D.C. and attended the rally on the Ellipse. Columbus told agents that he and Fatta walked down to the Capitol, following the crowd. Columbus initially told agents that he warned Fatta that it would be a crime to enter the Capitol, so they left and drove home. After agents warned Columbus that lying to law enforcement is a federal offense, Columbus admitted to going inside the Capitol with Fatta. Columbus claimed he did not want to go in, but was pushed in by a crowd and only stayed inside for thirty seconds.

*The Charges and Plea Agreement*

On May 24, 2023, the United States charged Columbus by criminal complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On June 5, 2023, law enforcement officers arrested Columbus in New York. On July 7, 2023, the United States charged Columbus by a four-count Information with violating the above statutes. On September 8, 2023, pursuant to a plea agreement, Columbus pleaded guilty to Count Four of the Information, charging him with a violation of U.S.C. § 5104(e)(2)(G). By plea agreement, Columbus agreed to pay $500 in restitution to the Architect of the Capitol.

**III.   Statutory Penalties**

Columbus now faces a sentencing on a single count of violating U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Columbus faces up to six months of imprisonment and a fine of up to $5,000. Columbus must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072,

1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of three years of probation with a condition of 14 days of home confinement and $500 in restitution.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Columbus' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Columbus, the absence of violent or destructive acts is not a mitigating factor. Had Columbus engaged in such conduct, he would have faced additional criminal charges.

Columbus marched into the Capitol, all smiles, shortly after the Parliamentarian door's violent breach. Once inside, Columbus witnessed destruction, heard other rioters chanting for violence against police, and was still not deterred. Instead, he only left after being pepper sprayed by police. After being expelled from the building, again Columbus was not deterred. He remained on the Upper West Terrace with Fatta, ignoring police officers' requests that he leave. Furthermore, when agents interviewed Columbus, he initially lied about his actions and then

9

presented a self-serving version of events that has been contradicted by the video evidence. Accordingly, the nature and the circumstances of this offense establish the clear need for the recommended sentence.

### B. The History and Characteristics of Columbus

A lengthy period of supervision is necessary to deter Columbus from engaging in future criminal behavior. Columbus' failure to fully recognized the seriousness of his actions was exemplified by his attempt to mislead FBI agents. Not until Columbus was warned he could be charged for lying to law enforcement did Columbus admit to entering the Capitol on January 6. Even then, Columbus downplayed his actions by claiming he was pushed into the building by others. The CCTV video captured the opposite, as Columbus was seen strutting in with a big grin on his face.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233 Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America, and that's the peaceful transfer of power.") (statement of Judge Berman-Jackson).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of this Court at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The recommended sentence reasonably affords Columbus the chance to be deterred from committing a similar crime in the future. As stated above, Columbus fully understood the seriousness of his actions from January 6 when he attempted to hide his involvement from authorities. Columbus has now accepted responsibility for those actions and a three-year probationary sentence will ensure he never engages in such activity again.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Columbus based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Columbus has pleaded guilty to Count Four of the Information, charging him in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Renee Fatta*, 23-cr-217 (CJN) Fatta, Columbus' co-defendant, received a sentence of 24 months reporting probation. Judge Nicholas cited Fatta's remorse and mitigation presented as the basis for his sentence. The government requested 14 days of intermitted confinement and 36 months of probation based on her conduct. Fatta smoked marijuana while inside the Capitol and had alarming social media posts including one celebrating the fear felt by members of Congress on January 6.

In *United States v. Michael Orangias*, 21-cr-265 (CKK), Judge Kollar-Kotelly sentenced the defendant to three months of home detention and 36 months' probation after he pled guilty to 40 U.S.C. § 5104(e)(2)(G). Orangias was inside the Capitol building for approximately five minutes, gave an interview to a podcast where he defended his actions and those of his fellow rioters, and twice lied to the FBI by saying he did not enter the building.

In *United States v. Chad Heathcote*, 22-cr-232 (CJN), Judge Nichols sentenced the defendant to 15 days home confinement as a part of 36 months' probation after he pled guilty to 40 U.S.C. § 5104(e)(2)(G). Heathcote only spent two minutes inside the Capitol and had no criminal history.

In *United States v. Paul Colbath*, 1:21-CR-650 (RDM), the defendant also pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G). Similar to Columbus: Colbath stayed inside in the Capitol Building for a short period of time (about five minutes which included the time he spent helping

13

the other rioter affected by chemical spray), he did not appear to post about January 6th on social media. Unlike Columbus, Colbath readily admitted his guilt, he expressed substantial remorse and he offered to cooperate with law enforcement in any way he could. Accordingly, under the special circumstances of that case, the Government recommended, and this Court gave, a home detention sentence for Colbath. Specifically, this Court sentenced Colbath to 30 days' home detention.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### IV. Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Columbus must pay $500 in restitution, which reflects in part the role he played in the riot on January 6.[5] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 14, 2022." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Columbus' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 93.

V.  **Conclusion**

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Columbus to three years of probation with a condition of 60 days of home confinement and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

        Respectfully submitted,

        MATTHEW M. GRAVES
        United States Attorney
        D.C. Bar No. 481052

By:   /s/ *Rebekah Lederer*
        REBEKAH LEDERER
        Pennsylvania Bar No. 320922
        Assistant United States Attorney
        U.S Attorney's Office for District of Columbia
        601 D St. N.W, Washington, DC 20530
        (202) 252-7012
        Rebekah.Lederer@usdoj.gov